IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 1:20cr181 |
| | ) | The Hon. Leonie M. Brinkema |
| FABIAN HUMBERTO TOVAR CAICEDO, | ) | |
| | ) | Sentencing Date: April 18, 2023 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S POSITION ON SENTENCING

COMES NOW, the Defendant, Fabian Tovar Caicedo ("Mr. Tovar") by and through counsel, and pursuant to Rule 32 of the Federal Rules of Criminal Procedure and this Court's policies and procedures regarding sentencing, states that he has received and reviewed a copy of the Presentence Investigation Report ("PSR") filed in this case with counsel, and the parties each have three unresolved objection as set forth below. In consideration of same, as well as of 18 U.S.C. §3553(a) ("3553"), the United States Sentencing Guidelines ("USSG" and/or "Guidelines") and *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005) and its progeny, Mr. Tovar respectfully presents his Position on Sentencing as set forth below:

## APPLICABLE LAW ON SENTENCING

The Court is mandated to exercise discretion in the imposition of a sentence that is "sufficient, but not greater than necessary" to achieve the enumerated objectives of criminal sentencing, and this exercise must include a consideration not only of the Guidelines, but also of each of the factors laid out in 3553. *See Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Nelson v. United States*, 555 U.S. 350 (2009).

1

The Guidelines, therefore, cannot be substituted for the sentencing court's independent determination of an appropriate sentence which necessarily includes full consideration of all of the 3553 factors. *Nelson,* 555 U.S. at 352. ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . .. The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." (emphasis in original) (citations omitted)); *see also, Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009). *Nelson* and *Spears* emphasize the purely advisory nature of the Guidelines and the *primacy* of the 3553 factors, objectives and mandate first set forth in *Kimbrough* and *Gall* and require federal courts to impose the lowest sentence that can accomplish said objectives.

However, where a statutory mandatory minimum applies, the court's discretion is limited in its application of 3553. In the case at bar, the applicable mandatory minimum is, an appropriate sentence and "no greater than necessary."

## POSITION ON GUIDELINE CALCULATION

I. *Defendant Objects to the Application of an Enhancement Pursuant to USSG § 3B1.3*

The enhancement for an abuse of a position of trust applies if the district court "determines that [he] abused a position of trust and that abuse significantly contributed to the commission or concealment of the crime." *United States v. Akinkoye,* 185 F.3d 192, 203 (4th Cir.1999). *See also* U.S.S.G. § 3B1.2 (2021). Furthermore, the Fourth Circuit has "emphasized that the "position of trust" inquiry must focus on the relationship between the defendant and the victim from the perspective of the victim. . . ." and" [t]here must be a trust relationship between [the defendant] and his victim for the enhancement to apply." *United States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003), citing *United States v. Gordon,* 61

2

F.3d 263, 269 (4th Cir.1995) and *United States v. Moore,* 29 F.3d 175, 180 (4th Cir.1994).

> A sentencing court must "carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity," *United States v. Bollin,* 264 F.3d 391, 415 (4th Cir.2001). (internal quotation marks and citation omitted), and those "where a 'fiduciary or personal trust relationship exists' with [the victim], and the defendant takes advantage of the relationship to perpetrate or conceal the offense," *United States v. Koehn,* 74 F.3d 199, 201 (10th Cir.1996) (citation omitted). Only the latter circumstances justify the enhancement.

*Caplinger,* 339 F.3d at 237.

In Mr. Tovar's case, the facts simply do not support an application of the enhancement, and his position with the Colombian Army was did not significantly contribute to the commission or concealment of the offense and no trust relationship exists between Mr. Tovar and the United States, which is the victim of this offense.

Mr. Tovar does work in army intelligence in Colombia, but in order to be introduced to a port official, he asked a family member. He did not have his own "connections to port officials," let alone connections by virtue of his position. He required a personal introduction. While his co-conspirator believed or assumed that Mr. Tovar would have his own connections to port officials, this was not in fact the case. Instead, Mr. Tovar approached his family member, whom he did not ask to introduce him to a "corrupt" port official. He was introduced to a Colombian Police Official indicating that the minister of defense—his co-conspirator's boss—needed a favor and he did not indicate what the favor was. From there, the co-conspirator took over the communications with the Officer, whom Mr. Tovar did not meet in person. He did not meet or entice this person by means of his position with the Colombian Army, and it was frankly not necessary to do so.

It should be noted that the abundance of cocaine leaving Colombia is due, in

part, to the policies of the government, including the very office of one of the main co-conspirators.

> Colombia's potential cocaine production reached a new historic high, the United Nations reported as President Ivan Duque continues to bungle his counternarcotics policy.
>
> In its annual report, the United Nations of Drugs and Crime said that drug traffickers were able to produce 1,228 metric tons last year, an 8% increase compared to 2019.
>
> The security forces were able to increase its cocaine seizures, but not enough to prevent an increase in potential exports that went up 2.6% to 772.3 metric tons, also a record in drug trafficking history.
>
> The drug traffickers' success was mainly due to their ability to optimize their production methods, which allowed them to produce more cocaine using less coca, the base ingredient for the illicit drug.
>
> Additionally, the narcos were able to take advantage from the Defense Ministry's disastrous counternarcotics policy that was possibly even more ineffective than predicted.
>
> Late Defense Minister Carlos Holmes Trujillo vowed to eradicate a record 130,000 hectares of coca last year, but ultimately reduced the number of hectares used for coca by only 7% to 143,000 hectares.
>
> Far-right President Ivan Duque has refused to implement a 2016 peace agreement with former FARC guerrillas, which collapsed a voluntary eradication program.
>
> Duque's new Defense Minister, Diego Molano, hasn't been able to lift the ban on the aerial fumigation of coca the president has been talking about since taking office in 2018.
>
> Counternarcotics experts have consistently warned the government's counternarcotics policy would fail but were ignored by the president whose party and political patron are being investigated for their alleged ties to the drug trade.

*https://colombiareports.com/amp/colombias-cocaine-export-estimates-highest-in-history-of-drug-trade/* , last visited April 11, 2023.

Mr. Tovar did offer to supply lists of DEA informants to the co-conspirators, but at that time, not only was the conspiracy in place, but it was also not true. He could not in fact

produce such a list, and the information he did provide did not serve, let alone substantially, to the commission or concealment of the offense. While his co-conspirator may have used *his* position with the defense ministry to facilitate the offense, the Fourth Circuit has held that "the *Pinkerton* principle of [USSG] § 1B1.3 does not apply to the abuse of trust provision in § 3B1.3. By its own terms, § 1B1.3 holds a defendant responsible only for reasonably foreseeable "acts and omissions" of his co-conspirators; it does not permit attribution of a co-conspirator's status to the defendant being sentenced." *United States v. Moore*, 29 F.3d 175, 178 (4th Cir. 1994). The defendant-specific language of USSG § 3B1.3 excludes application of the enhancement based on the acts of others. *Id.*

Finally, the Fourth Circuit has clearly stated that the "abuse of trust" must be vis a vis the relationship between defendant and victim. In other words, using the position of trust to victimize—i.e., to commit criminal abuses against a victim who is drawn in by the relationship to the defendant. The government contends that Mr. Tovar abused his position in the Colombian Army, but any position of trust he held with *Colombia* "does not govern [the court's] § 3B1.3 analysis" because the United States, not Colombia, is the victim in this case. *See* 21 U.S.C. 959. In fact, the offens is only punishable if the importation was intended or believed to be headed to the United States.

For these reasons, Mr. Tovar submits that an enhancement for abuse of position of trust should not apply.

II. *The United States Objects to an Enhancement for Bribery Under USSG § 2D1.1(b)(11) Not Being Applied*

It is appropriate that this enhancement not be applied in this case. First, the enhancement is again, defendant-specific. *See USSG § 2D1.1(b)(11).* Unlike, for

5

example, § 2D1.1(b)(7) which includes "defendant, or a person for whose conduct the defendant is accountable," this enhancement does not apply so-called "Pinkerton" liability to bribery. Mr. Tovar's co-conspirator arguably "bribed" the port official, by bringing him into the DTO, although simply offering a portion of proceeds is not necessarily a bribe.

It is also not clear that port officials at Santa Marta are in fact law enforcement officials, as much of the management and security at ports is privately contracted:

> Companies inside the port are major contributors in the supply chain, most of them are private. Services provided: container handling, loading and unloading of vessels, pilots services, vehicles, customs agency, port operators, support catering vessels, safety and inspection of goods. Note: Pilot assistance compulsory for vessels going in/out of the port as well for shifting between piers. Pilot station/boarding position 0.5 nautical mile at the light: Morro Grande. Santa Marta port control station and pilots can be contacted on VHF channels 11, 16 and 74. A pilot ladder shall be rigged on the starboard side of each Vessel unless otherwise instructed.
>
> Santa Marta International Terminal Company S.A. (SMITCO), is a company incorporated under a partnership between SSA International and Sociedad Portuaria de Santa Marta. It is constituted as a port operator; however, it is committed to managing, controlling and marketing the Container Terminal of the Port of Santa Marta. SMITCO has a wide portfolio of services for the handling of containerized cargo. The services provided are: Maritime operation, land operations, containers and container emptying, authorities inspection services, 24-hour sentry box service, areas for handling refrigerated cargo, connection and monitoring of refrigerated containers 24 hours, covered warehouse storage. for loose cargo handling, cargo traceability.

*[https://dlca.logcluster.org/display/public/DLCA/2.1.4+Colombia+Port+of+Santa+Marta](https://dlca.logcluster.org/display/public/DLCA/2.1.4+Colombia+Port+of+Santa+Marta), last visited April 11, 2023.*

The contact list (with names redacted) for officials for the port of Santa Marta is as follows, indicating that in fact private companies are contracted there:

| Santa Marta | General Manager | XXX@spsm.com.co comercial@spsm.com.co. | www.spsm.com.co | Seaport |

| Santa Marta | Foreign Trade Analyst | servicioalcliente@almagrario.com | www.almagrario.com/ | Solid bulk cargo |
| Santa Marta | Production Manager | commercial@intertug.com | http://www.intertug.com | Tugboats |

https://dlca.logcluster.org/display/public/DLCA/4.4+Colombia+Port+and+Waterways+Company+Contact+List, last visited April 11, 2023.

Primarily a coal port, Santa Marta's coal shipments are controlled by Carbosan, a subsidiary of a Dutch company. https://www.gem.wiki/Port_Society_of_Santa_Marta, last visited April 11, 2023.

Therefore, because the bribe was not made by defendant, and he cannot have inchoate liability for bribes paid by others, and due to the fact that the "law enforcement" status of the port official is questionable, the enhancement should not apply.

III.     The Enhancment Under USSG § 2D1.1(b)(16) Should Not Apply

The government takes the position that this enhancement should apply, but Mr. Tovar was not directly involved in the importation of drugs to the United States. He was a player in a large-scale conspiracy, to move cocaine to Mexico, knowing or having reason to believe some or all of it would wind up in the United States. He didn't supply it, cut it, package it, load it, ship it, transport it, or move it personally into the United States. In cannot be established, therefore, let alone with reasonable certainty, that he was directly involved with importation of drugs to the United States—only that he conspired that drugs would leave Colombia that would likely, in part, wind up here (and they did not). Once again, this is a defendant-specific enhancement, as well.

In light of the above, Mr. Tovar submits that his adjusted offense level should be 37, and that the advisory guideline range is 210-262 months.

# POSITION ON APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

   *I.   The Nature and Circumstances of the Offense*

Mr. Tovar, acting as a middleman to make introductions between the moneymen and the port officials was not minor under a USSG analysis, but was relatively lower than that of his coconspirators who would no doubt have accomplished their objective with or without him. In fact, the shipment the DTO attempted to export was seized at the port—so the enlistment of port officials was ineffective. The amount of money he was paid—whether it was 1 million or 2 million Colombian pesos-is less than $600 at best. He did not in fact provide a list of DEA informants (he could not have done so), he did not encrypt any phones, and his puffery—presumably to render himself more useful and deserving of higher payment—was for naught, as was the conspiracy itself.

   *II.   History and Characteristics of the Defendant*

Mr. Tovar is 41 years old, a husband, and father. He supports not only his wife and child, but his mother, whose own history is astonishing. *See* PSR at para. 52. He suffered the death of his father, a man of principle and an educator, at the hands of FARC, and he joined the army to fight them. And he assisted in taking down the leader during his service. But Colombia is Colombia. The rampant near legitimization of the cocaine trade in and from Colombia is a static storm cloud hanging over the beautiful country and its people. Where most of the country lives in poverty, as Mr. Tovar did his entire life including while fighting FARC and serving in his country's Army, the draw to participate in the industry in some capacity is ever-present. This is no excuse—Mr. Tovar makes no excuse for his behavior—but context is important. Aided by his own financial pressures, and the fact that the individual who sought Mr. Tovar's help was a trusted comrade, with whom he had served and trained for years, the storm cloud descended. As

the PSR indicates, this individual "implored" Mr. Tovar to help. PSR at para. 11.

But for his role as an organizer of introductions and meeting within the conspiracy, Mr. Tovar would qualify for the safety valve (USSG §5C1.2(a)(4) and 18 U.S.C. 3553(f)(4)). He has no criminal history, either in the U.S. (where he did train in Ft. Benning Georgia as a reward for his work in taking down the leader of FARC), or Colombia. If his co-conspirator and comrade had not "implored" him, he'd not have ventured into the drug trade.

*III. Deterrence and Promoting Respect for the Law*

Mr. Tovar has been detained since May 31, 2021. He agreed to be extradited but was not brought into marshal's custody until September 9, 2022. The intervening sixteen months were spent in La Picota prison in Bogota, Colombia. La Picota is infamous for its violence, overcrowding, and mistreatment of prisoners. As of 2022, Colombia's prisons were meant to hold 37,000 prisoners, but 122,000 were detained. https://gazettengr.com/forty-nine-inmates-die-in-colombia-prison-riot/, last visited April 11, 2023.The conditions at La Picota are such that one day in that prison cannot possibly be considered the equivalent of one day in an American detention facility, such as the Alexandria Detention Center. It is far, far worse, and constitutes a level of punishment that would not be tolerated in the United States, but which Mr. Tovar endured for sixteen months. Mr. Tovar experienced individual deterrence *immediately*, and it has only been reinforced by his time in the Colombian prison and the detention center.

As for general deterrence, studies have shown that longer sentences are *not* a greater deterrent to criminal behavior. *See* Wright, Valerie. "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment," (Nov. 2010). For those for whom it matters (i.e., those who would be deterred) *punishment itself is deterrence*. The Institute of Criminology at Cambridge University found

9

in 1999 that there was no evidence to support the notion that increased sentences resulted in greater deterrence but that there was evidence, from studies of offense rates in particular populations, that the greater the likelihood (or probability) of punishment, the lower the crime rate. *See id.* at 4 *citing* Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P.O. Wikstrom, "*Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*," Oxford: Hart Publishing, 1999. Leading scholars on the subject, Daniel Nagin and Greg Pogarsky, reached a similar conclusion: that "punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences." Wright at 4 *citing* Daniel Nagin and Greg Pogarsky. "*Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*," Criminology, 39(4), 2001.

Ten years is more than enough for specific and general deterrence.

IV.   The Kind of Sentences Available and Avoiding Disparity

As indicated, Mr. Tovar spent sixteen months in horrible conditions. Upon his release from incarceration, he will be deported back to Colombia. He will not see his family while in prison—they cannot afford to visit the United States. His ever-supportive wife will be without the sole breadwinner, and his mother will be without her his support as well. This has weighed, and will continue to weigh, on his conscience throughout his incarceration.

Mr. Tovar was never of a mind that he shouldn't take responsibility. He has consistently made that clear, even prior to being assigned counsel or having any sort of resolution before him. Others did nothing until a deal was on the table. Co-conspirators who instigated the formation of the DTO, had the connections to the actual suppliers and cartels in Mexico—where the cocaine was to go from Colombia—have received sentences of 144 months. In recognition of this, the government seeks

the same sentence for Mr. Tovar. Mr. Tovar seeks a sentence of 120 months based on the lesser role he played in the conspiracy as a facilitator only between individuals at the port and his co-conspirators, rather than suppliers and cartel members, who were already known to and in league with co-conspirators.

WHEREFORE, Mr. Tovar respectfully prays that the Court impose a variant sentence of 120 months and prays that the Court make explicit in its order that he should be given credit for time served since May 31, 2021 when he was arrested in Colombia for the instant offense.

Respectfully Submitted,

FABIAN HUMBERTO TOVAR CAICEDO
By Counsel

THE LAW OFFICE OF LANA MANITTA, PLLC

By: _____/s/_____.
Lana Manitta, VSB #42994
140B Purcellville Gateway Drive, #511
Purcellville, VA 20132
(703) 705-4428  FAX (703) 705-4429
Lmanitta@Manittalaw.com
Counsel for Defendant

### CERTIFICATE OF ELECTRONIC FILING

I HEREBY CERTIFY THAT on April 11, 2023, I filed the foregoing with the clerk of the court using the CM/ECF system which will forward an electronic copy to all counsel of record.

By: _____/s/_____.
Lana Manitta, VSB #42994
140B Purcellville Gateway Drive, #511
Purcellville, VA 20132
(703) 705-4428  FAX (703) 705-4429
Lmanitta@Manittalaw.com
Counsel for Defendant